## TOUTLOFF *v.* KING.

1. APPEAL AND ERROR—QUESTIONS REVIEWABLE—MOTION FOR NEW TRIAL.

   In reviewing judgment entered on verdict for plaintiff, questions involved are reviewed as though no motion for new trial had been made where motion therefor was not filed until more than 20 days after entry of judgment, such motion was dismissed, and review of such dismissal was sought in, and denied by, Supreme Court (Court Rule No. 47 [1933]).

2. SAME—DIRECTED VERDICT—CURING ERROR.

   Error of trial court in failing to direct verdict for corporate defendant upon its motions therefor at the close of plaintiff's proofs and again at the close of all proofs because of failure to show any connection with an alleged assault upon plaintiff was cured by subsequent action of court in dismissing action as to such defendant.

3. SAME—QUESTIONS    REVIEWABLE—INSTRUCTIONS—REQUESTS    TO CHARGE.

   In an action for alleged assault, brought against two individuals and one corporate defendant, whether or not failure of trial court so to instruct jury as to permit it to absolve from liability those not responsible for plaintiff's injuries resulted in reversible error in absence of a specific request for such an instruction is not determined where reversal is had upon other grounds.

4. TRIAL—COLLATERAL ISSUES—PREJUDICE.

   In action against hotel manager, hotel owner and a corporation owning a tavern across the road, the stock of which was largely owned by the hotel owner, for injuries sustained when plaintiff was ejected from the hotel, persistence of plaintiff's counsel in repeatedly stressing throughout the trial, over objection by defendants' counsel and rulings by the court, of many circumstances and incidents which were not properly issues in the case constituted reversible error because designed to prejudice jury upon the merits of the case.

5. SAME—PREJUDICE—FAIR TRIAL.

   The parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice.

6. SAME—COLLATERAL MATTERS—PREJUDICE—EXCESSIVE VERDICT.
     Conduct of plaintiff's counsel in action for injuries sustained
       upon ejection from hotel, which consisted of persistent inter-
       rogation of witnesses on collateral matters in the face of
       adverse rulings and admonitions by the court and in his at-
       tempt to argue to the jury about such matters constituted
       reversible error where it was reflected in a verdict of $12,500
       for a comparatively small amount of damages and against a
       party in no way connected with the alleged assault.

Appeal from Gogebic; Landers (Thomas J.), J.
Submitted June 3, 1942. (Docket No. 29, Calendar
No. 41,803.) Decided September 8, 1942.

Case by Chester R. Toutloff against John H.
King, alias John H. Kunsky, John J. Garber, alias
John J. Garbarek, and Gateway Inn, Inc., a Wiscon-
sin corporation, for personal injuries sustained in
being ejected from a hotel. Verdict for plaintiff.
Case dismissed as to Gateway Inn, Inc. From judg-
ment against defendants King and Garber, they
appeal. Reversed and new trial granted.

*Edward W. Massie* (*C. D. Dwyer,* of counsel), for
plaintiff.

*Charles M. Humphrey* and *Charles M. Humphrey,
Jr.,* for defendants.

CHANDLER, C. J. Defendant John H. King, a resi-
dent of Detroit, is the sole owner of King's Gateway
Hotel situated near the State line between Michigan
and Wisconsin, and defendant, John J. Garber, is in
his employ as manager of said hotel. Defendant, the
Gateway Inn, Inc., is a Wisconsin corporation and
the owner of the Gateway Inn, a tavern situated
directly across the road from the hotel, and which
is located partly in Michigan and partly in Wiscon-
sin. A small portion of the stock of said corpora-
tion is owned by defendant Garber and one Sarah

DeMers, the balance and majority interest being held by defendant King. Defendant Garber is also in the employ of the corporation as manager.

The ownership of these properties and the connection of the parties therewith as above set forth was the same on September 15, 1939, and for some time prior thereto.

The record discloses that on September 14 and 15, 1939, the Lake Superior Mining Institute held a convention at King's Gateway Hotel. This Institute is a voluntary association whose membership comprises mining men of the upper peninsula of Michigan, northern Minnesota and northern Wisconsin, and it appears to be the custom to hold occasional meetings at some place designated by its officers for the discussion of subjects of mutual interest and advantage, for the purpose of making new acquaintances and renewing old ones, and for recreation and entertainment. All of the some 50 rooms in the hotel as well as the bar, dining room and kitchen were reserved by the Institute for the use of the members and their guests, and all food, drinks and rooms for the two days were paid for by the Institute.

The plaintiff, a resident of Chicago, was and is engaged in the business of selling securities. He was a former resident of Ironwood and had a somewhat extensive acquaintance with the members of the Institute, and had on an occasion in 1926 attended one of its meetings. He was in Ironwood on September 14th and 15th, and during the afternoon of the 15th accompanied one Dr. Eisele to the meeting of the Institute. However, it quite conclusively appears from the record that he was neither a member of the Institute nor an invited guest. After arriving at the hotel between 5 and 6 o'clock in the evening, plaintiff commenced drinking quite freely

both at the hotel bar and at the bar of the tavern across the street, and undeniably became intoxicated and obnoxious to the members of the Institute and their guests at the hotel. Later, between 9 and 10 o'clock, he went to sleep in a chair in the hotel bar. At this time, some of the members of the Institute went to defendant Garber, the hotel manager, and requested that plaintiff be removed from the hotel as he was neither a member nor a guest of the Institute and his attitude was both embarrassing and obnoxious. Subsequent happenings are in dispute.

Plaintiff's version of the affray which resulted in this litigation is as follows:

"I remember walking over to this chair and falling asleep for just a little while. It was more or less a stupor. And if you can recall anything when you are waking, I remember somebody shaking me and saying, 'Go lie down.' I was wanting to go to Ironwood and I was shaking him off, I can remember. If I remember, a voice said, 'Room 48,' and I said, 'Keep your hands off me.' I certainly did not strike at anybody but I remember, the thing I heard was, 'All right, come on!' and I was grabbed from behind. It was a regular bum's rush. I saw Garber on the right shoulder and somebody at the left and I said, 'Please let me walk out of here,' because I didn't want that to happen to me in front of all these people. So when I got to the door there was a step and I was picked up and slammed right down on the road and got a bad cut across the eye. I must have been dizzy for 12 hours after that. I got up and shook myself off and said something—I don't know what I said. I noticed blood was streaming down. Immediately I said to somebody, 'Go and get Dr. Eisele.' Well, Dave came out with a first-aid kit or I believe one of their men came out and started to patch me up and I believe Dr. Eisele, and I tried to laugh it off the best I could. I said, 'Doc,

please come back and get me to Ironwood.' I was there in total disgrace in front of the hotel; I was sitting there on a bench abutting the highway. Well, I sat there for—gracious, it must have been an hour and there was some old Cousin Jack sitting next to me and I said, 'Will you ask for Dr. Eisele?' I said that I was in distress. He said it was none of his affair. So finally I noticed Clayt Kohlhaas coming out, followed by some men, so I said, 'Clayt, will you take me to Ironwood?' and he said, 'Why, certainly, Chester.' So he helped me in, in the car and left me out in front of the St. James Hotel in Ironwood.''

Two witnesses who were in front of the hotel gave testimony corroborative of that of plaintiff that he was thrown or pushed out of the front door of the hotel.

The following testimony is defendant Garber's version of the affair:

"*A.* The first time I saw Mr. Toutloff was when my attention was called to his sleeping in a chair in the taproom of the hotel. * * *

"*Q.* What did you observe about his appearance?

"*A.* Well, his hair was disheveled around his face, spit and what not was running out of his mouth and he was sprawled down in the chair, with his feet hanging in front of him, in kind of a straight, outright position, has (his) back against the wall, with his hat crushed against the wall. * * *

"*Q.* Now, Mr. Garber, you took Mr. Toutloff from the seat in the barroom out to the front door of the hotel, is that right?

"*A.* Yes.

"*Q.* And why did you do that?

"*A.* On the orders of these members of the Mining Institute. (Objection)

"*The Witness:* (Continuing) I was requested to offer the man a room. * * *

"*Q.* Will you tell us the story as to what you did from the time you first approached Mr. Toutloff until you left him at the door?

"*A.* I approached Mr. Toutloff from the front position. He was facing me and I started to shake him by the shoulder to wake him up since he was sleeping or appeared to be. He did not awaken very easily so I continued to shake him and when he did arouse a bit he started in cursing and raised his arm at me in a way to strike me. I took his arm and folded it down in front of him and continued to offer him a room or told him he would have to leave the place entirely. I made that clear to him and he got up in a half rising position in a way to start a fight with me so I took his left arm and grabbed him by the collar of his coat on the back of the neck, with my right hand, and started walking him to the front door, through the passage facing west from the taproom and desk. I walked him through the lobby and front porch, which is adjoining the lobby, and I let his arm go with my left hand and opened the hotel front door going out and continued to hold him by the collar. When I got him about three feet clear of the front door I released him and he walked about two or three steps and fell in front. I stayed there about a second and he picked himself up, kind of shook himself and walked over and sat down on the bench on the right-hand side of the hotel going out."

At least four witnesses gave testimony corroborative of the foregoing statements of defendant Garber.

As a result of being evicted from the hotel and falling down, or from being pushed or thrown out, plaintiff received a cut over the right eye which required suturing by a surgeon, a slight cut on the right cheek and minor injuries to his wrist. None of these were of a serious or permanent nature. Subsequently, this action was brought and the trial

before a jury resulted in a verdict for $12,500 in favor of plaintiff against all of the defendants.

At the close of plaintiff's proof, each defendant separately moved for a directed verdict, decision on which was reserved. Again at the close of all the proof and after both sides had rested, these motions by each defendant were renewed, decision on the same being reserved by the court. After verdict, the trial court rendered the following opinion:

"This is an action wherein the plaintiff seeks damages from the defendants for an alleged unlawful eviction from premises known as the King's Gateway Hotel, situated in Vilas county, Wisconsin. The cause of action arose on the evening of September 15, 1939, while the plaintiff claims he was there as a guest and invitee. The case was submitted to a jury, who rendered a verdict in favor of the plaintiff and against all of the defendants. The defendants moved for direction of verdict as to each of the defendants, and the motions were reserved by the Court.

"The motion for direction of verdict as to the defendants John H. King, alias John H. Kunsky, and John J. Garber, alias John J. Garbarek, will be denied, the evidence presenting a question for the jury.

"As to the defendant, the Gateway Inn, Inc., a Wisconsin corporation, there is no proof in the record that said corporation was the owner, lessee, or in any manner engaged in the management of the Gateway Hotel, where this altercation arose; neither is there any proof in the record that the said defendant corporation employed or had any control over the defendants John H. King and John J. Garber, and the motion for direction of verdict as to the Gateway Inn., Inc., is hereby granted."

On May 29, 1941, judgment on the verdict was entered against defendants King and Garber.

On June 6, 1941, notice of entry of judgment was served upon the attorneys for defendants and on June 9th proof of service of such notice was filed.

On June 28, 1941, more than 20 days after entry of judgment, defendants filed and served notice of a motion for a new trial. Plaintiff moved for dismissal of said motion because of failure to comply with Court Rule No. 47 (1933), providing that a motion for a new trial should be filed and served within 20 days after entry of judgment, which latter motion was granted by the trial court. Defendants then petitioned this court for a writ of mandamus to review this action of the trial court which petition was denied. Thereafter, defendants King and Garber filed application for a delayed appeal which was duly granted, and the cause is now before us for determination of numerous alleged errors assigned by appellants.

In our review of appellants' assignments of error, we must deal with the questions involved the same as though no motion for a new trial had been made.

The one and only count of plaintiff's declaration charged appellants and the Gateway Inn, Inc., with the commission of a tort, and the trial court submitted the case to the jury upon the theory that all three must be found guilty or not guilty.

We have examined the record with care and it unquestionably discloses that there was not one iota of testimony in any way connecting the defendant corporation with the ownership, management or control of King's Gateway Hotel or the wrongs charged in plaintiff's declaration.

At the close of plaintiff's proof, counsel for the corporate defendant moved for dismissal of the case as to it because the proof had not shown that it was in any way involved in the alleged assault or resulting injuries, which motion was denied by the

trial court. At the close of all the proof, this motion was renewed and decision thereon was reserved by the court.

We are at a loss to understand why the trial court did not grant the corporate defendant's motion to dismiss prior to submission of the case to the jury. It was clearly error as against said defendant to submit to the jury the question of the liability of this defendant in the total absence of any testimony or circumstances connecting it with the alleged tort. However, this error was cured by the subsequent action of the court in granting the motion to dismiss.

The liability alleged in the declaration was against the three defendants. Under the charge of the trial court, but one of two forms of verdict was possible, one finding all defendants guilty of the alleged assault or one finding all not guilty. The jury was given no other alternative. A thorough review of the court's charge permits of no other interpretation.

The Gateway Inn, Inc., was continued as a defendant jointly liable with appellants until after the verdict. Plaintiff was permitted on rebuttal to introduce in evidence records of the corporate defendant showing that it was a $200,000 corporation and that defendant King was the owner of nearly all of the stock therein.

We are of the opinion that each of the defendants was entitled to a charge by the trial court that would permit the jury to absolve from liability those that were not responsible for plaintiff's injuries under the facts. As to whether the failure of the court so to charge, in view of the fact that no specific request for such an instruction was made, constitutes reversible error, we do not determine as we find that the case must be reversed for other reasons.

It is contended by appellants that the court erred

in many instances in receiving and rejecting testimony to the prejudice of appellants; that plaintiff's attorney was guilty of prejudicial misconduct in the examination and cross-examination of witnesses and in his argument to the jury; that the court erred in his charge to the jury and in refusing to charge as requested by appellants.

For an intelligible review of the alleged errors, we find it necessary to quote quite extensively from the record.

The following occurred on redirect examination of plaintiff by his counsel:

"*Q.* Mr. Toutloff, had you heard of Mr. Garber before you went to the Mining Institute on that day and the reputation of the Gateway?

"*Mr. Humphrey:* I object as incompetent, immaterial and irrelevant.

"*The Court:* The witness may answer the first part of that question by 'yes' or 'no.'

"*A.* Yes.

"*Mr. Massie: Q.* Was there any reason why you were reluctant about staying there?

"*A.* Indeed there was.

"*Q.* What was it?

"*Mr. Humphrey:* I object as incompetent, immaterial and irrelevant.

"*The Court:* I think the objection is good.

"*Mr. Massie: Q.* Was there any reason why you did not resist this man taking hold of you when he started to eject you from this place?

"*A.* There certainly was.

"*Q.* What was that?

"*A.* Mr. Garber has the reputation for being very brutal, he has done it to others and he has storm troopers around him. I cannot go down the street and do business marked up.

"*Q.* Did you see any officers out there?

"*A.* Two policemen and a patrol car going up and down outside.

"*Q.* Did you know at the time he took hold of you of any specific instances where he beat up other persons?

"*Mr. Humphrey:* I object as incompetent, immaterial and irrelevant.

"*The Court:* Specific instances? The objection is good.

"*Mr. Massie:* It is to show why this plaintiff did not resist.

"*Mr. Humphrey:* The plaintiff already testified he did not know what happened, that he was in a daze.

"*Mr. Massie:* When he started out he knew what was going on, when he was aroused.

"*Q.* How many instances—you say you heard about this man's reputation before?

"*A.* Yes.

"*Q.* State whether or not his reputation for being brutal in ejecting people, without cause, out of that hotel is generally known throughout the district?

"*Mr. Humphrey:* I object as incompetent, immaterial and irrelevant.

"*The Court:* Objection overruled.

"*A.* His reputation is well established in the entire Upper Peninsula, wherever you go, whether in the copper country, Marquette, Escanaba, Iron Mountain or any place else."

The following is taken from the cross-examination of defendant Garber:

"*Q.* Mr. Garber, this isn't the first assault you have made on individuals at this place, is it?

"*A.* Yes, it is.

"*Q.* How about this Jerry Gendron you blackjacked and cut his face from ear to ear.

"*A.* I deny that.

"*Q.* You helped throw him out?

"*A.* I did not.

"*Q.* What part did you take in it?

"*A.* No part. I stood by and seen it done.

"*Q.* You saw Stark pull a gun? .

"*A.* I did not.

"*Q.* You saw him hit Gendron with a blackjack?

"*A.* No, sir, I did not.

"*Q.* He was in the other part of the hotel, in the inn?

"*A.* I don't know.

"*Q.* You were right there?

"*A.* I don't know of the man being at the hotel.

"*Q.* He was at the bowling alleys?

"*A.* Yes.

"*Q.* You remember the incident?

"*A.* Yes.

"*Q.* You were there?

"*A.* Yes.

"*Q.* You had occasion to have one of your men deputized?

"*A.* Yes.

"*Q.* Stark—you had that done through "Packy" McFarland?

"*A.* No, sir, he was from Wisconsin.

"*Q.* Wasn't he from Michigan?

"*A.* No, sir, I don't know what you are talking about from Michigan.

"*Q.* Sparks—do you recognize that name?

"*A.* Yes, but he was not a deputy from Michigan.

"*Q.* He was there in the other place where your alleys were?

"*A.* Possibly so.

"*Q.* You took hold of Jerry Gendron and started to put him out, didn't you?

"*A.* I did not.

"*Q.* Did you arm this deputy, Sparks, with a blackjack and a gun?

"*A.* No, sir, that is part of his duty to carry them. He is bonded by the county.

"*Q*. You got hold of Gendron with the assistance of Sparks on that occasion?

"*A*. No.

"*Q*. How about the time you tossed out Joe Kelly?

"*A*. I did not.

"*Q*. How about the time you tossed Mr. Joyce out?

"*A*. I didn't.

"*Q*. How about this priest from Phelps that was out there and you didn't know he had a clergical collar—he was up with Gustafson?

"*A*. I don't recall any such incident, any such affair.

"*Q*. How many more cases are there of guests that have come to the inn or to the hotel that you have taken upon yourself to go up to and shake and get your deputy to help throw them out on their heads?

"*A*. None. I don't make that a business.

"*Q*. You threw Joe Kelly out?

"*A*. I did not.

"*Q*. You are around there all the time?

"*A*. I am.

"*Q*. These deputies don't go into the place and throw them out?

"*A*. No, if they are not disorderly.

"*Q*. You do tell them to put them out at times?

"*A*. If they are disorderly and annoying the guests, the guests are entitled to that protection.

"*Q*. This fellow, Gendron, your deputy, Sparks, cut him from his ear to his eye with a blackjack?

"*Mr. Humphrey:* I think this has gone too far. The witness testified he did not eject this man and Mr. Massie is trying to make a grandstand play out of something that somebody else did.

"*The Court:* Yes, I don't think you should go into any other cases at this time, Mr. Massie.

"*Mr. Massie: Q.*   You weigh how much, Mr. Garber?

"*A.*   About 170 pounds.

"*Q.*   Toutloff, you say, would weigh about 140 pounds?

"*A.*   I wouldn't have any idea.

"*Q.*   When you started Toutloff out the front door, you had a New York cop grip on him?

"*A.*   No, sir.

"*Q.*   You are somewhat of a boxer yourself?

"*A.*   No, sir.

In rebuttal, plaintiff called as a witness Jerry Gendron who testified:

"*Q.*   Your name is Jerry Gendron?

"*A.*   Yes, sir.

"*Q.*   Mr. Gendron, you were subpoenaed to come here this morning?

"*A.*   Yes, sir.

"*Q.*   You did not want to come did you?

"*A.*   No, sir.

"*Q.*   Will you remove your glasses, Mr. Gendron?

"*A.*   Yes.   (Witness removes his glasses.)

"*Q.*   You have a scar extending from here to here (indicating from left ear to left eye)?

"*Mr. Humphrey:* I object as improper, prejudicial and it is not rebuttal in any way.   The testimony here, your Honor, shows the defendant, Garber, had nothing to do with this.

"*Mr. Massie:* This is to show this man Garber has a reputation for attacking others.

"*Mr. Humphrey:* The fact this man, this witness, has a scar has nothing to do with this case.   This is prejudicial.

"*The Court:* The objection is good.   It is improper to attempt to impeach on collateral matters or issues.

"*Mr. Massie:* I don't know what you mean by 'collateral'?

"*The Court:* Something outside of the case.

"*Mr. Massie:* This goes to the issues on his defense, that he acted in self-defense, knowing he had a bad reputation. In the case in 80 Mich., it is perfectly competent for the plaintiff to show the reputation of the defendant in isolated cases, and also for the purpose of impeaching Mr. Garber, who stated yesterday he took no part in the ejecting of Mr. Gendron.

"*The Court:* The objection is good. We will only try one lawsuit here.

"*Mr. Massie:* Does the court rule that we are not permitted to show the affair with this witness, that this witness had at the Gateway with Mr. Garber?

"*The Court:* It is purely outside the issues in this case and improper to attempt to impeach on a collateral matter. You may have an exception, Mr. Massie.

"*Mr. Massie:* All right, you may be excused, Mr. Gendron."

On cross-examination, defendants' witness Warren, house manager of the hotel, stated:

"*Q.* Did you happen to be present at the time Garber and Sparks had this incident with Gendron?

"*A.* No, I was not.

"*Q.* Did you see any blood on Toutloff's face when sitting out on the bench?

"*A.* No.

"*Q.* You didn't see any bleeding at all?

"*A.* No, no bleeding.

"*Q.* Didn't you send a first-aid kit out with Dr. Eisele?

"*A.* No.

"*Q.* Who furnished that first-aid kit?

"*A.* That I don't know.

"*Q.* You saw the start of it and you heard the commotion and saw Garber push him out and you saw him on the bench and you don't know about the first-aid kit?

"*A.* No, I did not know that there was first aid administered there.

"*Q.* You didn't care?

"*A.* I don't know as I particularly cared. The man was quite out of the way and perfectly all right.

"*Q.* You thought it perfectly all right he was thrown out under the condition?

"*A.* Yes, I did.

"*Q.* That has been the attitude of the management for two or three years?

"*A.* I wouldn't say so.

"*Mr. Humphrey:* I. object to counsel injecting remarks of that kind. The evidence is that that was not the attitude of the management.

"*The Court:* That is for the jury—proceed.

\* \* \*

"*Q.* As resident manager of the hotel, you are responsible to Mr. Garber and Mr. King for the management of the bar?

"*A.* Not exactly the management. My duties are to close the bar in the evenings, which I do.

"*Q.* You have people coming in there every day that come in and look over the place?

"*A.* Yes.

"*Q.* You don't tell them to get out or stay out?

"*A.* I already said I have never seen any other person ejected; this is the only time I have seen a man or person ejected from the hotel.

"*Q.* That is at the hotel?

"*A.* Yes.

"*Q.* You do go a lot over to the other place?

"*A.* I don't know anything about the other place; I have no business there; I am not over there very much; my duties are at the hotel.

"*Q.* You wouldn't know how many were thrown out of the place where the bowling alleys are?

"*Mr. Humphrey:* I object to emphasizing that; the witness says he does not know anything about that.

"*The Court:* Objection sustained."

Defendants' witness Suino, bartender at the hotel, testified on cross-examination:

"*Q.* Your regular place is over at the bowling alley?

"*A.* Yes, I work at all the bars.

"*Q.* You are shifted around?

"*A.* Yes, sir.

"*Q.* Were you over there the day that Jerry Gendron had this affray with Garber and Sparks?

"*A.* I don't remember the affray at all, sir.

"*Mr. Humphrey:* If the court please: I object to that as trying to inject in this case something that never happened. The undisputed evidence and testimony is that nothing like that ever happened.

"*The Court:* It has been gone into by witnesses on both sides.

"*The Court:*  *Q.* Did you see anything of him?

"*The Witness: A.* No, I did not."

During the cross-examination of defendants' witness Wilde, desk clerk at the hotel, the following occurred:

"*Q.* You didn't throw out any of the people that came to the blowout?

"*A.* I didn't throw anybody out.

"*Q.* I don't believe you did either, Mr. Wilde—your hotel has a reputation for that conduct?

"*A.* I would not say that.

"*Q.* You know there has been quite a lot of criticism about throwing these people out down there?

"*A.* I don't know that there has been."

On cross-examination of defendant Garber, he testified as follows relative to the corporate defendant:

"*Q.* Mr. King owns what corporation (proportion) of the shares of stock in the corporation?

"*A.* The major part.

"*Q.* How many shares do you hold?

"*A.* 100, I believe.

"*Q.* What is the authorized capital stock of the corporation?

"*A.* $200,000.

"*Q.* All been issued?

"*A.* Yes.    *    *    *

"*Q.* Have you ever received any dividends from that?

"*A.* No, sir.

"*Q.* King takes care of that, does he?

"*A.* It isn't much to take care of, it isn't on a paying basis.

"*Q.* You take in $1,000 some Saturdays on slot machines down there, don't you?

"*A.* No, sir.

"*Q.* How many slot machines are there in that place, Mr. Garber?

"*Mr. Humphrey:* I object as incompetent, immaterial and irrelevant.

"*The Court:* The objection is good.

"*Mr. Massie:* I want to show the earnings and what becomes of them and show Mr. King holds all the stock and controls all the dividends of this King's Gateway, Inc., the corporation.

"*The Court:* I think the defendant should be advised of his constitutional rights.

"*Mr. Humphrey:* It is not shown there is anything in common between the Gateway Inn and King's Gateway Hotel.

"*Mr. Massie:* This man as a member of the corporation never attends any meetings and there is no accounting made of the money.

"*The Witness:* I object. I say there is an accounting made. I said the accounting is made in Detroit where the major bookkeeping is done for both.

"*Mr. Massie: Q.* King's Gateway, Inc., takes care of the money?

"*A.* What money?

"*Q.* The corporation?

"*A.* Each business takes care of its own.

"*Q.* You are his manager and you say the reports are sent to the Detroit office?

"*A.* Yes.

"*Q.* Now, Mr. King is also interested in several large theatre corporations?

"*A.* No, sir.

"*Q.* Has he some other enterprises in Detroit?

"*A.* He is a silent partner in the radio broadcasting business.

"*Q.* He is a silent partner in the radio broadcasting business?

"*A.* Yes.

"*Q.* He has the patent right on Hi-Yo Silver?

"*Mr. Humphrey:* I object as incompetent, immaterial and irrelevant.

"*The Court:* The objection is good."

In his opening argument to the jury, counsel for plaintiff stated:

"*Mr. Massie:* Mr. Toutloff earned $10,000 of [to ?] $15,000 a year as a bond salesman.

"*Mr. Humphrey:* I object. There is no such testimony in this case.

"*Mr. Massie:* Yes, there is.

"*The Court:* The jury will remember the testimony; if it is not in the evidence, the jury will disregard it.

"*Mr. Massie:* Let's examine some of the defendants. Mr. King, the owner of the Lone Ranger or Hi-Yo Silver, was not there.

"*Mr. Humphrey:* There is no evidence on that.

"*The Court:* Stay within the evidence, Mr. Massie.

"*Mr. Massie:* Mr. King approved of the manner in which Mr. Toutloff was ejected.

"*Mr. Humphrey:* There is no evidence of the fact that Mr. King approved of the manner in which Mr. Toutloff was ejected.

"*Mr. Massie:* He approved of the ejectment.

"*Mr. Humphrey:* I ask the court to instruct the jury it is prejudicial.

"*The Court:* I believe the witness, Garber, said that Mr. King approved of it. If he did not, that testimony will be disregarded by the jury.

"*Mr. Massie:* Why isn't Mr. King here to dispute that?

"*Mr. Humphrey:* I take exception to the remark of counsel for plaintiff. There is no evidence in this case that Mr. King was there or knew anything about the case.

"*Mr. Massie:* There is evidence he approved of it.

"*The Court:* No, there is no evidence that Mr. King was there or knew anything about the eject-ment at the time it occurred.

"*Mr. Massie:* We put a witness, Mr. Gendron, on the stand and he was not permitted to testify by the defendant.

"*Mr. Humphrey:* I take exception to the remark of counsel and ask the court to instruct the jury that that is improper argument.

"*The Court:* Counsel for defense had no say in allowing his testimony and the jury are instructed to disregard that statement.

"*Mr. Massie:* We produced him here, we admit—

"*Mr. Humphrey:* I object to counsel continuing to argue on that.

"*The Court:* (To the jury) The jury will disre-gard that.

"*The Court:* (To counsel) Let's stay within the issues of the case.".

In his closing argument, the following occurred:

"*Mr. Massie:* Garber testified as to his version of it but they wouldn't let Gendron testify as to his part of it.

"*Mr. Humphrey:* I object. The court has ruled that is not proper argument. Defense counsel had nothing to do with that.

"*The Court:* Yes, do not pursue that argument, Mr. Massie, I ruled out the testimony of Mr. Gendron."

At the close of all the proof, defendants made the following motion which was denied by the court:

"*Mr. Humphrey:* If the court please: I ask that the record show the jury is not present in the courtroom, and defendants at this time move for a mistrial on the grounds that the calling of the witness, Jerry Gendron, and, without any foundation whatsoever, having him take off his glasses and exhibiting his scar to the jury is prejudicial and improper and we object to the conduct of plaintiff's counsel in doing that without laying any foundation whatsoever and to his remarks and to his calling the jury's attention to the scar, which is on the left side of the witness' head, facing the jury."

We think the most serious errors alleged by appellants was the conduct of plaintiff's counsel in his insistence in pursuing the Jerry Gendron incident in his cross-examination of defendant Garber and other witnesses after an adverse ruling by the trial court, in placing Gendron on the witness stand to exhibit his scarred face to the jury, in attempting to impeach Garber on collateral matters, and in attempting to argue to the jury the reasons why Gendron was not permitted to testify as to his version of how he secured these scars. Because this incident occurred at the Inn, not at the hotel, because the scars were occasioned by reason of an altercation between Gendron and one Stark, an officer, in which defendant Garber was not involved, and because the only reasonable inference that can be drawn from the record is that such facts were known by counsel for plaintiff, we reach the conclusion that his conduct was not actuated by over-

zealousness, but resulted from a studied effort to smear Garber and the enterprises in which he was interested, as well as the other defendants, and was calculated and designed to prejudice the jury upon the merits of the case.

We conclude that it was reversible error for plaintiff's counsel, over objection and rulings and instructions of the trial court, repeatedly and persistently to stress throughout the trial the many circumstances and incidents which were not properly issues in the case.

This court on many occasions has reversed cases for far less prejudicial misconduct and statements by the attorney for the prevailing party than those shown by the record in the instant case. In *Layton v. Cregan & Mallory Co., Inc.,* 269 Mich. 574, 580, 581, 583, the plaintiff's attorney, in arguing to the jury, said:

" 'I spoke about gross negligence a while ago. When I said "gross," I didn't mean it in a technical sense. I meant it in a term of degree, a high degree of negligence; almost inconceivable that a man would do that. He was not drunk. If he was drunk, you might have some conception about it; but his negligence was such that he should have been put in prison.' "

Defendant's counsel objected to this argument as an appeal to the passion of the jury and requested the court to instruct the jury that it be disregarded. The trial court said:

" 'I think the objection is well made and the jury should disregard this remark made by Mr. Bloem, to the effect that Baum, the driver of this car, should be—committed a crime for which he should be committed to prison. For the sake of the record, it may appear that the remarks were made by Mr. Bloem in a rather conversational tone, not with any particular emphasis, not impassioned at all in man-

ner, and probably in the best of good faith; but it is my judgment that the jury should disregard those remarks. I am not aware of any crime that Baum committed on the facts shown in this case. I am not aware that he could have been committed to prison for anything that the testimony shows he did or failed to do. I think the jury may well disregard it.' ''

On appeal, after citing a large number of cases, we said:

"The general principle underlying all these cases is that the parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice. The statement complained of should not have been made. The trial court so held, and reduced the jury's award of damages $1,500. The argument was either proper and harmless, or erroneous and prejudicial. Plaintiff claims on cross-appeal it was harmless. I think it was prejudicial and reversible error."

In *Van Hartesveldt* v. *Westrate,* 264 Mich. 538, 545, an alienation of affections case, one of the errors assigned on appeal by defendant was the attempt by counsel for plaintiff to procure testimony from his witness by the following examination:

"*Q.* Did the doctor ever say anything to you as to whether or not he had been accused of any misconduct with anybody else?

"*Mr. Lokker:* I object to that, your honor.

"*The Court:* Objection sustained.

"*Q.* Did he ever tell you anything about whether he loved his wife?

"*Mr. Lokker:* I object to that again, your honor.

"*The Court:* Sustained.

"*Q.* Did he ever tell you anything about what he would do if he found any other man around his home, making love to his wife?

"*Mr. Lokker:* I object to that, your honor.

"*The Court:* Sustained.

"*Q.* What if anything did the doctor ever say to you about what he would do if he found any other man around his house?

"*Mr. Lokker:* Just a minute, before you answer that, I object to it, your honor.

"*The Court:* Sustained."

In commenting on the foregoing procedure, we said:

"These questions were highly improper and prejudicial. They cannot be justified by plaintiff's claim that they were designed to show the highly confidential relationship between defendant and plaintiff's former wife. One of them might have been overlooked. When one improper question after another is propounded tending to engender prejudice and arouse the indignation of the jury, counsel's persistence constitutes reversible error, notwithstanding the fact that the questions are excluded by the court as quickly as they are asked."

In *Nemet* v. *Friedland,* 273 Mich. 692, plaintiff's counsel in his closing argument to the jury, said:

" 'I think this man, like the Jew Shylock, was after the last pound of flesh and last drop of blood.' "

In connection therewith, and upon objection by defendant's counsel, the trial court stated:

" 'I think we had better confine ourselves to the record in the case, and the jury will disregard the last statement of counsel.' "

In disposing of defendant's appeal in that case, we said:

"There was no logical reason growing out of the testimony why plaintiff's counsel should use the language above quoted. Its obvious purpose was to create prejudice. We find no other error.

"Judgment reversed, with costs. New trial granted."

We think it may be said in this case that the obvious purpose of counsel's attitude in the direct examination of plaintiff, the cross-examination of defendant Garber and other of defendants' witnesses, the calling of witness Jerry Gendron to exhibit his scarred face to the jury and in interrogating him on collateral matters in the face of adverse rulings and admonitions by the court, and in his attempt to argue to the jury the reasons why Mr. Gendron was called as a witness by plaintiff and prevented from testifying by defendants, was to create prejudice in the minds of the jurors. That it did have the effect desired by counsel is clearly reflected, not only in the size of the verdict for the comparatively small amount of damages sustained by plaintiff, but also in the verdict of the jury in awarding damages against the corporate defendant against which there was a total lack of any testimony connecting it with the alleged assault.

In connection with the matter under discussion, see *Cluett* v. *Rosenthal,* 100 Mich. 193 (43 Am. St. Rep. 446); *Boydan* v. *Haberstumpf,* 129 Mich. 137; *Ward* v. *Reed,* 134 Mich. 392; *Martin* v. *Fisher,* 143 Mich. 462; *Reed* v. *Louden,* 153 Mich. 521; *Hughes* v. *City of Detroit,* 161 Mich. 283 (137 Am. St. Rep. 504); *Stowe* v. *Mather,* 234 Mich. 385.

Appellants are entitled to a fair trial, uninfluenced by passion or prejudice. This they have not had as we view the record and authorities.

We find no prejudicial error in the charge or rulings of the court that are apt to occur upon another trial.

Judgment reversed and the case remanded for a new trial. Appellants shall recover costs.

B**OYLES**, N**ORTH**, S**TARR**, B**UTZEL**, B**USHNELL**, and S**HARPE**, JJ., concurred. W**IEST**, J., did not sit.